**EXHIBIT A**

State of Illinois          )
                           ) ss
County of St. Clair        )

## UNSWORN DECLARATION UNDER PENALTY OF PERJURY
## IN SUPPORT OF COMPLAINT FOR FORFEITURE

I, Mark Rigel, do hereby depose and declare under penalty of perjury the following:

At all times relevant herein, I have been a Task Force Officer (TFO) with the Drug

Enforcement Administration (DEA).   The contents of this Declaration are based on information

provided to me during the course of my investigation from participants in the criminal activity,

from other witnesses, and from other law enforcement officers.

1.      On November 6, 2012, DEA Deputized Granite City, Illinois Police Officer Kevin

Thebeau (TFO Thebeau) and DEA Deputized Columbia, Illinois Police Officer Zach Hopkins

(TFO Hopkins) observed a 1999 green Ford Taurus station wagon traveling Southbound on

Interstate 55.   The Taurus was driving without headlamps on while it was raining and the

vehicle's windshield wipers were not on.   TFO Thebeau noticed a temporary registration on the

vehicle from an unknown state.   TFO Thebeau and TFO Hopkins followed the Taurus as it

merged onto Interstate 270 Westbound and conducted a traffic stop on that vehicle near the exit

to Illinois Route 159.

2.      TFO Thebeau approached the vehicle on the driver's side and observed that the

vehicle was also occupied by a female.   TFO Thebeau advised the driver of the reason for the

stop while TFO Hopkins spoke with the female passenger.   TFO Thebeau requested that the

driver step from the vehicle and have a seat in the squad car due to the rain.   The driver

complied.   TFO Thebeau asked the driver for his driver's license and the driver produced a

Michigan license which identified him as John Fitzgerald SMITH.

3.      TFO Thebeau advised SMITH that he would be issued a warning for the offense of no headlamps when required.   While issuing the warning, TFO Thebeau asked SMITH who the female passenger was and SMITH advised that she was his fiancé.   TFO Thebeau asked SMITH if he had recently purchased the vehicle and SMITH advised that he had purchased the vehicle on November 5, 2012, for approximately $2,800.00 cash and that the car lot had issued him the temporary tag.  SMITH further stated that he was moving from Detroit and was traveling to Las Vegas where his brother had promised him a job.   TFO Thebeau noticed that it did not appear that SMITH was moving because the vehicle did not contain a lot of items.   TFO Thebeau asked SMITH if his vehicle contained all of his belongings and SMITH advised it did not.   SMITH advised that he was going to Las Vegas to check out the job and if he liked it he would go back to Detroit and retrieve his remaining belongings.   SMITH then advised he was first going to Lincoln, Nebraska to see his daughter.   TFO Thebeau advised SMITH that due to the high gas prices it would have made more economic sense if SMITH would have traveled a more direct route to Lincoln.   SMITH advised he was unsure why he came this direction.

4.      TFO Thebeau then contacted TFO Chris Singleton and TFO Phil Koch and requested the assistance of TFO Singleton's K9 Paco.   TFO Thebeau then ran SMITH through the computer and observed that SMITH had an extensive criminal history.   TFO Hopkins then entered back into the squad car with the female passenger's driver's license which identified her as Starneatris Renee WILLIAMS.

5.      TFO Hopkins advised that WILLIAMS stated that SMITH was her fiancé and that they were traveling to Las Vegas, but WILLIAMS had no idea that they were traveling to

2

Lincoln, Nebraska to visit SMITH's daughter.

6.     TFO Thebeau then issued SMITH the warning and completed his enforcement action.   Believing that SMITH and WILLIAMS may be involved in illegal activity due to the recently purchased vehicle, SMITH and WILLIAMS inconsistent travel plans, SMITH's criminal history, and the fact that SMITH and WILLIAMS were traveling from a city known to be a source of illegal narcotics, TFO Thebeau asked SMITH if officers could walk a police K9 around the vehicle and SMITH agreed.

7.     TFO Singleton arrived on scene and met with TFO Thebeau.   TFO Thebeau then asked SMITH if there were any illegal drugs in the vehicle and SMITH stated there was not. TFO Thebeau then asked SMITH if there were any large sums of currency in his vehicle and SMITH stated there was not.   TFO Singleton then deployed his K9, Paco, and started the sniff at the driver's side front headlamp and followed K9 Paco as he worked in a counterclockwise direction around the vehicle.   When K9 Paco arrived at the rear passenger side door seam of the vehicle TFO Singleton observed Paco's head turn and Paco began sniffing emphatically on the passenger side rear door seam of the vehicle. This is a behavior that K9 Paco displays when he is attempting to locate the source of the odor.   K9 Paco then began nose poking and scratching the door seam of the vehicle.   This is a positive alert of K9 Paco's to the presence of drug odor.

8.     TFO Singleton returned K9 Paco to his patrol vehicle.   TFO Singleton then advised TFO Thebeau of his findings and then explained the K9 alert to SMITH and WILLIAMS.   TFO Thebeau again asked SMITH if there were any illegal drugs in the vehicle and SMITH then advised there was a small amount of marihuana in a black gym bag in the trunk.  TFO Thebeau then advised SMITH that officers were going to search his vehicle due to the K9

3

indication and SMITH's admission of drugs in the vehicle.

9.      TFO Singleton and TFO Koch searched the trunk area of the vehicle while TFO Thebeau searched the passenger area of the vehicle.   Upon searching the black gym bag in the back seat area, TFO Thebeau located a white plastic Macy's bag which contained a large sum of loose currency in different denominations.   TFO Singleton then advised that he had located a small amount of marihuana in the trunk area.

10.      Both SMITH and WILLIAMS were placed under arrest for unlawful possession of cannabis and both suspects were then transported to the Granite City Police Department along with their vehicle.   While en route to the police department, TFO Thebeau contacted declarant and requested declarant's assistance in the interview of the suspects.

11.      Upon arriving at the police station SMITH and WILLIAMS were placed into separate interview rooms.   TFO Thebeau then placed the seized currency into a brown paper evidence bag and placed two other evidence bags in the Sally port area of the police station. TFO Singlton then retrieved K9 Paco from his patrol vehicle and walked K9 Paco past the bags. Upon K9 Paco's arrival to the third bag TFO Singleton observed K9 Paco's head turn and K9 Paco began sniffing emphatically and then began nose poking and scratching on the third bag indicating a positive alert to the presence of drug odor on the third bag.   TFO Singleton advised that K9 Paco had indicated on the evidence bag that contained the seized currency.

12      Declarant met with SMITH at the Granite City Police Department where SMITH read, signed and waived his Miranda rights.   SMITH stated verbally that he would be willing to answer questions without an attorney present.   Declarant asked SMITH the purpose of his trip. SMITH stated that he and WILLIAMS were going to Las Vegas, Nevada to look for work.

4

SMITH stated that they were going to meet a friend of his named "Dave", but SMITH could not give "Dave's" last name. Declarant asked SMITH where "Dave" lived in Las Vegas. SMITH stated that he did not know, but SMITH was going to call "Dave" and surprise him when SMITH got there as "Dave" did not know they were coming. Declarant asked SMITH where they were going to be staying once they arrived in Las Vegas and SMITH replied that they might stay with "Dave" or "wherever".

13.     Declarant asked SMITH if he was currently employed. SMITH stated that he was a self-employed carpenter in Detroit, Michigan. Declarant asked SMITH if he charged by the hour of if he bid out the jobs according to the amount of work to be done. SMITH stated that he mostly bid out the jobs but that there was a flexibility in price depending on how much running he would have to do to collect the materials he needed.

14.     Declarant asked SMITH how he obtained the cash money that was located in the duffel bag in his car. SMITH stated that he had just finished working on a house and that he was paid $30,000.00 in cash for the job. Declarant asked SMITH if SMITH could provide the name of the person who owned the house that SMITH had worked on and that had paid him $30,000.00 cash. SMITH stated "those people won't talk to the police." Declarant asked SMITH why they would not be willing to verify his employment and the cash payment. SMITH said "these people come in with stacks of cash" and indicated with his hands approximately 16 to 18 inches high. SMITH further stated that it would be stacks of tens, twenties, fifties, and hundreds in cash and stated "you know where it comes from and that's why they won't talk to you." Declarant stated to SMITH that he thought it was a lot of money to be paid for working on a house. SMITH stated that the people that he works for pay him in cash and that he doesn't

5

ask any questions about where the money comes from.

15.     Declarant asked SMITH how much money he had made last year as a freelance carpenter.  SMITH stated that in 2011, he had made at least $80,000.00.  Declarant asked SMITH if he had any check stubs or receipts to verify his employment.  SMITH stated that he gets paid in cash and that most of his jobs were referrals.  Declarant asked SMITH if he had reported his earnings to the IRS and if he had paid state and federal taxes on his earnings. SMITH replied no.  Declarant asked SMITH when the last time was that he had paid federal and state income taxes.  SMITH stated he thought it was in 2005.  Declarant asked SMITH if he used marihuana.  SMITH stated that he does not drink and that, yes, he does smoke marihuana on a daily basis.

16.     Declarant then met with WILLIAMS at the Granite City Police Department where WILLIAMS read, signed and waived her Miranda rights.  WILLIAMS stated verbally that she would be willing to answer questions without an attorney present.  Declarant asked WILLIAMS the purpose of her trip.  WILLIAMS stated the she and SMITH were going to Las Vegas, Nevada to look for work.  Declarant asked WILLIAMS if she was currently employed to which she stated no.  WILLIAMS then stated that she had not been employed since 2008 and had not drawn any unemployment benefits.  Declarant asked WILLIAMS if she had a bank account to which WILLIAMS stated no.  WILLIAMS stated that she did not handle the money or pay the bills.  Declarant asked WILLIAMS how she knew SMITH.  WILLIAMS replied that she had known and lived with SMITH as boyfriend and girlfriend for the past nine years.

17.     Declarant asked WILLIAMS if she smoked marihuana.  WILLIAMS stated that she has smoked marihuana on a daily basis for the past sixteen years.  Declarant asked

6

WILLIAMS how she paid for her marihuana habit.   WILLIAMS stated she just gets it.

WILLIAMS would not provide a direct answer as to where she gets her marihuana or how much

she pays for it.   Declarant asked WILLIAMS if she ever sold marihuana.   WILLIAMS denied

ever selling any marihuana to anyone.

18.     Declarant asked WILLIAMS who they were going to meet in Las Vegas to which

WILLIAMS replied a guy named "Dave" to try to find some work for her boyfriend.   Declarant

asked if WILLIAMS knew the address of "Dave" and WILLIAMS stated that she did not know

the address but that they were supposed to call when they arrived in Las Vegas.   Declarant asked

WILLIAMS if they were going to be staying with "Dave".   WILLIAMS stated that she did not

know where they would be staying.   Declarant asked WILLIAMS if the money found in the car

belonged to her.   WILLIAMS stated that it was not her money and signed a Disclaimer form.

19.     The currency seized by agents on November 6, 2012, was counted and the total

amount seized consisted of $22,680.00.

20.     Based on the foregoing, declarant believes that the subject-matter $22,680.00 in

United States Currency constitutes money furnished or intended to be furnished by a person in

exchange for a controlled substance, or proceeds traceable to such an exchange, or money used to

facilitate a violation of 21 U.S.C. § 801 *et seq.* and is subject to forfeiture pursuant to 21 U.S.C. §

881(a)(6).

Executed on this   *17* day of April, 2013.

_____
MARK RIGEL
Drug Enforcement Administration

7